# CHARLESTON.

NEWS PUBLISHING COMPANY *v.* DENISON-PRATT PAPER CO.

Submitted May 15, 1923. Decided June 5, 1923.

1. NEW TRIAL—*On Motion to Set Aside Verdict, All Parol Evidence by Party Against Whom Verdict Rendered in Conflict With Evidence of Adversary Must be Rejected.*

   On a motion to set aside a verdict all parol evidence introduced by the party against whom the verdict was rendered, which is in conflict with the evidence of his adversary, must be rejected and not considered. (p. 247)

2. FRAUDS, STATUTE OF—*Statute of Another State Relied on to Defeat Recovery Must be Interposed in Manner Required Therein, and it Cannot be Relied on Under the General Issue.*

   In an action at law to recover damages for breach of contract, if defendant relies upon the statute of frauds of another state to defeat recovery, claiming that the contract was made and to be performed in that other state, and that the lex rei contractus governs the recovery thereon; in order to make such defense available the statute of frauds of that other

state must be interposed in the manner and with the particularity required by the laws of that other state; and if such laws require the statute of frauds to be pleaded specially to be availing there, it cannot be relied upon in this state under the general issue.  (p. 247).

3.  SAME—STATUTES—*Facts Bringing the Action Within the Statute of Another State Must be·Pleaded; Statute of Another State Need not be Pleaded, as Courts of This State Take Judicial Notice of Laws of Sister States.*

Where the pleadings in such action do not disclose that the contract sued on was made or to be performed in another state, if defendant relies upon the statute of frauds of that other state, the facts which bring the action within the statute of that other state must be pleaded.  The statute itself need not be pleaded, as the courts of this state take judicial notice of the laws of the sister states.  (p. 250).

4.  SALES—*Measure of Damages When Vendor Fails to Deliver Goods and Time of Delivery Postponed by Agreement Stated.*

Generally, the measure of damages where a vendor fails to. deliver goods sold· is the difference between the contract price and the market value at the time when and the place where the goods should have been delivered; but if the time of delivery be postponed by agreement of the parties express or implied, or by their acquiescence in such postponement to a subsequent date, the latter is to be considered as the time for the comparison of values.  (p. 251).

5.  SAME—*Date. of Breach of a Contract for Delivery of Goods Becomes Jury Question Where Rendered Uncertain by Terms of Agreement or Postponement by Parties.*

When the exact time for delivery of the goods is uncertain, rendered so either by the terms of the agreement, or by postponement or acquiescence of the parties, the date of the breach thereof, if any, becomes a jury question under the evidence and circumstances aided by proper instructions.  (p. 251).

Error to Circuit Court, Wood County.

Action by the News Publishing Company against the Denison-Pratt Paper Company. From an order setting aside a verdict against defendant, plaintiff brings error.

*Reversed, and judgment for plaintiff.*

94 W. Va.

*Reese Blizzard, Frank A. Obrien* and *C. M. Hanna,* for plaintiff in error.

*Merrick & Smith,* for defendant in error.

Lively, Judge:

This writ of error is prosecuted by the News Publishing Company from an order of the circuit court of Wood county entered on the 4th day of April, 1922, which set aside the verdict of a jury for $8,750.00 in favor of plaintiff, against the defendant, Denison-Pratt Paper Company.

The action is assumpsit brought by the News Publishing Company, hereinafter called plaintiff, to recover damages from Denison-Pratt Paper Company, hereinafter called defendant, for the breach of an alleged verbal contract made between the parties in September, 1919, for the purchase by plaintiff from defendant of 100,000 pounds of Aldrich newsprint paper, at the price of 5¼ cents per pound, and for the breach of another contract alleged to have been made in March, 1920, for the sale by defendant to plaintiff of 20 tons of St. Regis paper at 6¼ cents per pound. The paper was never delivered. Plaintiff purchased other paper on the market and the excess beyond the contract price is the sum laid as damages.

Defendant is a non-resident corporation, and an attachment was issued, two resident newspaper companies being designated as owing debts and holding property belonging to defendant. These newspapers answered that they had funds in their hands belonging to defendant amounting to $7,348.98. Defendant appeared specially, gave a bond in lieu of the money attached and the garnishees were discharged. Defendant filed a plea in abatement denying any liability on the contracts and denying the ground for attachment, and issue was thereon joined and the case tried on this issue, resulting in the verdict above set out, which, upon motion of defendant, was set aside and a new trial awarded. As above stated this writ is to the order of the circuit court setting aside the verdict and awarding a new trial.

In 1919 newsprint paper became scarce, and the price rapid-

ly advanced toward the close of that year and continued to advance the following year. Plaintiff purchased paper for several large newspapers in this state, and was represented in the city of New York by A. E. Clayden, who had been purchasing newsprint paper for it and other newspapers for many years. Clayden, the manager of plaintiff's New York office, was desirous of purchasing paper for plaintiff, and had approached Arthur D. Gray, who was resident manager of defendant, and whose office was on Broadway. The executive office of defendant was in Boston, Massachusetts. Clayden says Gray represented to him that he had 100,000 pounds of paper which he could sell, and he then arranged for a meeting with Ogden, the secretary of plaintiff company when he came to New York to purchase paper. Accordingly, Ogden came to New York for that purpose in September, 1919, and the meeting was had with Gray at the Biltmore Hotel, where Gray again represented that he had the 100,000 pounds of paper to sell, for which he quoted a price to Ogden of $5.25 per hundred; that Ogden agreed to take it at that price; the first car of which was to be shipped some time in October and the second at a later unnamed date; that the contract was then made on those terms, and Ogden said he would have Clayden to verify the order on the following day. Clayden, accordingly, on September 26th, confirmed the order by a letter to defendant company at Boston, marked "Attention Mr. C. A. Gray," and which stated that it was a confirmation of the conversation held at the Biltmore hotel and was for two cars of newsprint, one to be shipped as early in October as the defendant could do so, and the other to be shipped at a later date; advising that the order covered the two cars of Aldrich paper that was agreed upon, and the price $2.25 f. o. b. mill, with the direction, "Ship the paper to the News Publishing Company, Wheeling, West Virginia," and signed "The News Publishing Company," with the initials of the writer, "A.E.C." A carbon copy of this confirmation was also mailed to Gray's New York office on the same day. Clayden says that Kearney, secretary or stenographer to Gray, 'phoned him a day or so

thereafter that Gray had advised him, Kearney, of the mistake in the price stated in the letter; that he immediately went to Gray's office and from there talked with Gray over the 'phone at defendant's office in Boston and told him of.the error·in the price and corrected it so as to make it $5.25, the price agreed, and then wired him to that effect, the telegram having been prepared by Kearney and sent from Gray's New York office. ·Clayden says the next meeting he had with Gray was about the middle of October when he inquired why the paper had not been sent, to which Gray replied that the mills were slow, but he would ship it as soon as he could get it; that witness then reminded him that he had represented, both before Ogden came and at the time the contract was made, that he already had the paper; that at that time Gray admitted receiving the wire in correction of the price stated in the confirmation letter. ˙He says Gray told him about the first of November that one car of paper had been shipped; that afterwards witness advised Gray that the car had not been received, and ·was informed that he was doing his best to get the car through. Afterwards, about the 1st of February, 1922, Ogden again came to New York, and together they saw Gray at his office, who then informed them that he had a car of 66″ paper at some other mill, and after getting in telephone communication with some mill advised them that he would have it cut into 33″ rolls and send a part of that. On February 7th Clayden again saw Gray about the matter, who told him he was sick of the whole affair and would give $1,000 if the Aldrich contract was called off. Witness informed Ogden of the offer, who would not accept it, saying he wanted the paper. Clayden says that about March 11th Gray told him he had written to Ogden that he could send him some paper at 6¾ cents per pound, ·and some time after that Gray advised him that Ogden was threatening a suit and that he then repudiated the contract declaring that he would not furnish any of. the paper. Ogden confirms Clayden's evidence of what occurred in February at Gray's office, and says that Gray then promised to have the paper sent, and would ship some of it in a few days, and said he was having

trouble in getting the mills to fill orders. Gray's evidence as to the making.of the contract is that it was about the 15th or 16th of September at the Biltmore hotel when he met Ogden and. Clayden, and Ogden told him his wants. He says he told Ogden that he could take care of two cars; 60 tons was the quantity which he was in position to supply him with at the time, and the price was agreed upon at 5¼ cents net, thirty days f. o. b. mill, Natural Dam, New York, Aldrich Paper Company paper. He says the offer was accepted verbally and Ogden was to confirm the same when he returned to Wheeling. One car was to be shipped in October and the balance at a later date, no date being mentioned. Nothing was said about the mill accepting the order at that time. He says that after a week or ten days had passed, and not receiving confirmation of the order, he called Clayden over the 'phone and advised him that he had not received confirmation, and told him that there would be some question about whether he could secure the paper as it was getting harder to get tonnage and paper was being offered subject to prior sale. In a day or so later he received a letter from Clayden in confirmation of the conversation at the Biltmore, whereby he confirmed the purchase of the 60 tons of Aldrich paper and asked that the letter be accepted as an order, but that he had put the price down at 2¼ cents. He then called Clayden's attention to the mistake in price, and the latter brought the carbon of the letter to his office and the price was there changed to the price agreed upon and that he told him then that he didn't think there was much chance of getting the paper, but that he would do his utmost. He says it was his custom to place .the orders with the Boston office for confirmation and later place the orders with the mills direct, himself, but that he could not say whether or not he so stated to Ogden when the contract was made. He says he saw Clayden in .October, and possibly in November, and had several conversations with him over the 'phone but at no time did he tell him that the paper had been shipped nor did he at any other time tell any one that any paper had been shipped. He says he consistently told

Clayden that he had been unable to get the mills to accept the order. He says he never saw Ogden after the meeting at the Biltmore, and had no conversation with him in company with Clayden at his office in February. He says that on March 11th Clayden informed him that the Wheeling News was in desperate need of paper and that he told Clayden he had some tonnage of St. Regis paper which he would have cut to 33″ rolls and would let him have 20 tons of that paper, and asked him if he would be willing to pay 6¾ cents per pound at the mill. On cross examination he says the error in the price mentioned in the confirmation letter was corrected two or three days after he received a carbon copy.

Kearney, the secretary and stenographer to Gray, says the carbon letter came to the office about the 1st of October, and he noted that the price was incorrect and attempted to get in touch with Clayden to have it corrected but failed to do so and that it was about two weeks afterwards that Clayden came to his office and then inquired about the paper, when he was told of the mistake in the order, and he details a conversation with Clayden resulting in a change in the price as contained in the carbon. This witness corroborates Clayden and Ogden to the effect that they both came to Gray's office in the spring of 1920 and conferred with Gray in his presence and possibly in the presence of a salesman for defendant company concerning the delivery of this Aldrich paper. He says there was no statement made in his presence by Gray that the Aldrich paper or any part thereof had been shipped. He says Gray explained why he was unable to get the paper from the mill, saying that the mill owner was filling high priced orders and was disregarding low priced orders. It will be seen that Kearney's recollection contradicts both Gray and Clayden as to the time the correction was made of the price in the confirmation letter. It will also be noted that he contradicts Gray and confirms Ogden and Clayden in the fact that they were in Gray's office in the spring of 1920 insisting upon the fulfillment of the contract.

The testimony of these witnesses concerning the making of the contract and the subsequent conversations relating

thereto has been detailed with more than usual length, the object being to show the discrepancies upon which the jury was called upon to consider and determine. It will be noted that there is a substantial agreement as to the terms of the contract made at the Biltmore hotel. Both Clayden and Ogden say Gray represented to them that he had the 100,000 pounds of paper which they bought. Gray says that at that time he had control of 60 tons which he agreed to sell at 5¼ cents per pound. Nothing was said about having the defendant confirm the order placed with Gray; and nothing was said about the trades or customs concerning the placement of the order for paper with the mills. The confirmation letter of September 26th states the subject matter, price, terms and where to ship the paper. There seems to be no controversy over the substance of that letter, or that it did not state the contract, except as to the price which was clearly a clerical error. The controversy in that regard is as to the time when the clerical error was corrected. Clayden says is was on the 27th of September, the next day after the letter was written, and that he then talked with Gray, who was at the Boston office, over the long distance 'phone, and confirmed his talk by a telegram prepared by Kearney and sent from the New York office. The claim is made by defendant that this failure to correct promptly the error in price prevented placing the order with the mill, and caused the failure of delivery within the time designated. It does not appear what became of the 60 tons of paper which Gray says he had at the time the contract was made at the Biltmore. Why it was necessary for him to place the order with the Aldrich mill does not clearly appear. The rule is well established that in considering a motion to set aside a verdict rendered on a conflict of oral testimony that that part of the testimony in favor of the one who moves to set aside the verdict, which is in conflict with the evidence of his adversary, cannot be considered. Hence, in considering the motion the evidence of plaintiff must be taken as true. This rule obviates the discrepancies above noted.

The other contract for the sale and purchase of 20 tons

of St. Regis paper sued on is not the subject of so much controversy. On March 11, 1920, defendant by Gray addressed a letter to the Wheeling News stating that in order to help them out of their present difficulty he had told Clayden that he "would take 20 tons of my 66″ tonnage and have the mill cut it to a full 33″ roll and ship the same to you the last of this month," and asking if plaintiff would be willing to pay the exact cost of the paper, 6¾ cents per pound, for the St. Regis paper; stating that when the Aldrich paper was received, if it was received, it would be billed at the old price; and stating that the car then offered at 6¾ cents per pound was not to apply on the other order but to be treated as an entire separate transaction and asking, if the proposition met with approval, to advise at the earliest possible moment. On the following day plaintiff promptly accepted the proposition stating that it was to have no bearing on the contract for the Aldrich paper, and insisting that the Aldrich people be compelled to live up to the contract, even if it was necessary to go to the extent of suing them for damage, and directed shipment of the St. Regis paper at the earliest possible date. Gray acknowledged this letter on the 15th. of March, saying he would try to ship the St. Regis car of 33″ rolls that month and that plaintiff might be assured, if he received the Aldrich paper, plaintiff should certainly have it. These letters are signed by A. D. Gray, followed by "Denison-Pratt Paper Co." We do not find that Gray denied writing these letters. Kearney, his secretary and stenographer, was examined by plaintiff in this regard and stated that the letters had been dictated to him by Gray and were signed by Gray, or he, the stenographer, had signed them at his direction.

Following the alleged repudiation of the two contracts by Gray in the latter part of March, 1920, plaintiff bought newsprint paper of similar character and quality to that of the Aldrich and St. Regis paper, wherever it could be obtained. It appears from Ogden's testimony that spot paper had then advanced to 12c, 13c and 14c and in some cases 16c per pound; that immediately after the repudiation of the contracts he

bought paper at the best prices obtainable, at Steubenville, Columbus, Pittsburgh, Philadelphia, Cincinnati, New York, and wherever it could be purchased, to the extent of 140,000 pounds, paying therefor in excess of the price he would have paid under the contracts, the sum of $11,271.69, which is the amount of damage claimed by reason of the breach of the two contracts. The first purchase was on May 5, 1920, at 10½c and the other purchases were at variant prices. The purchases in New York from Maurice Omeara & Co. were at 12½c and from Interstate Pulp & Paper Co., of the same city, at 11c per pound. These purchases extended over the months of April, May and June. Spot paper was hard to obtain, and many newspapers suspended publication for lack of paper. Some of plaintiff's newspapers reduced the number of columns published and restricted advertising. An emergency existed. Evidence for plaintiff showed that the market price for spot paper ranged from 11c to 14c at the mill, wherever the mill was located, at this period, as shown by quotations from the manufacturers and the mills. On the part of defendant several witnesses said that during the fall months of 1919 and the winter and spring of 1920, the price of St. Regis paper and Aldrich paper ranged from 5½ to 7½c, and that by exercising ordinary diligence a purchaser would not have had to pay the excessive prices. Others say there was no market for St. Regis paper during the spring of 1920, and that the Aldrich mills were burned in June of that year. Gray says that in 1920 up to July, Aldrich paper could be bought for 6¼c and St. Regis paper not above 7c. Why he did not furnish the Aldrich paper at 5¼ cents during this period is not explained. Plaintiff bought paper in September, 1920, in New York at 11c and in April and May of that year at 12½c and 13¾c f. o. b. mills. So again, there is a wide divergence in the prices, tending to affect the amount of damages,—a jury question. It will be noted that plaintiff paid in excess over the contract price for the 140,000 lbs., the sum of $11,271.69; and the jury awarded $8,750, evidently having weighed the conflicting evidence on this point. By witnesses Knode, Becker, Green, Hastings and Gray,

all paper brokers and representing mills, defendant sought
to show trade customs and usages existing in New York at the
time of the contracts to the effect that the broker customarily
sent his orders direct to the mill which acknowledged on a
form prepared for that purpose direct to the customer; and
that it was the custom not to recognize as a contract any
agreement which was not reduced to a paper writing in some
form; that where the broker sold as representing the mill,
the contract was not regarded as binding until there had been
an acceptance or confirmation by the mill; but if the broker
sold the paper as his own, no custom would require confirm-
ation from the mill or any one else. The court refused to
allow this proffered evidence to go to the jury, and we think
properly so. It is true the contract was verbal, but trade
customs cannot obviate the binding legal effect of a verbal
contract. The verbal contract was confirmed in writing,
about which there seems to be no controversy except the mis-
take in the price, and the time and manner of its correction.
The paper bought was the paper which Gray says he "was in
a position to supply him with at that time," (60 tons), and
which Ogden and Clayden say was represented as defend-
ant's paper. Nothing was said or intimated about accept-
ance of the order by the mills, or confirmation of the con-
tract by the Boston office of defendant. "No principle of
law is better settled than the one that an express contract
embodying in clear and positive terms the intention of the
parties cannot be varied nor contradicted by evidence of
usage or custom.   *   *   *   *   *   Usage may be admissible
to explain what is doubtful; it is never admissible to contra-
dict what is plain." 2 Elliott on Contracts, sec. 1713; 27 R.
C. L. p. 189. Professor Williston says the general rule of
the force of custom in the law of sales is the same as in all
other contractual agreements, and is that, "Particular usages
and customs of trade or business must be known by the party
to be affected by them, or they will not be binding, unless
they are so notorious, universal, and well established, that his
knowledge of them will be conclusively presumed." Williston
on Sales, § 618. No effort is made to show that Ogden knew

of any particular custom or usage prevailing in the New York paper trade. It follows that defendant's instruction No. 2, which would have told the jury that the trade customs would govern the formation of the contract was properly refused. There was no evidence to support it.

At the conclusion of the evidence defendant tendered and the court gave defendant's instruction No. 3, which told the jury that if they believed plaintiff's claim was based on an oral agreement for the sale and delivery of 100,000 lbs. of paper of the value of $50 or upwards, then plaintiff could not recover unless the jury further believed that plaintiff had accepted a part of said paper and actually received same, or given something in earnest to bind the contract or in part payment thereof, or unless some note or memorandum in writing of said contract or sale had been signed by defendant or its agent. This instruction is based on the first section of the New York statute of frauds. The theory of defendant is that the contract, if any there was, was a New York contract to be executed in that state, and the law of the place of the contract was a part of the contract and governs in its enforcement in this state. It asserts that the lex conractus governs instead of the lex fori, and therefore the statute of frauds of New York was applicable. Plaintiff contends that the place of delivery of the Aldrich paper was Wheeling, W. Va.; that the New York statute of frauds ''does not render such contracts void and is only a limitation of judicial authority on the courts of New York to afford a remedy. It refers only to the remedy, and as to the remedy the laws of West Virginia, where the suit was brought, apply.'' Many citations and much argument are directed to these respective contentions. But could defendant rely upon the New York statute in this manner, even upon the assumption that it was a New York contract to which the statute would apply in a forum of this state? It was not pleaded. It is very well established in many states that foreign statutes will not be judicially noticed, but are considered as facts which must be pleaded and proved as other facts. 20 Ency. Pl. & Pr. 598; 25 R. C. L. 948. But there are some conditions, though,

under which the laws of one state may be judicially noticed by the courts of another. *Creelman* v. *Lesh,* 73 Ark. 16; 3 Anno. Cas. 108; *Gleason* v. *Thayer,* 87 Conn. 248. Our statute, however, sec. 4, chap. 13, Code, provides that whenever it becomes material to ascertain what is the law of another state, either common or statutory, the court shall take judicial notice thereof. What is the necessity of pleading anything which is within the judicial knowledge of the court? *Spring* v. *Am. Tel. & Tel. Co.,* 86 W. Va. 192. The defense of the statute of frauds may be made under the general issue. *McClanahan* v. *Otto Marmet C. & M. Co.,* 74 W. Va. 543; *Alkire* v. *Orchard Co.,* 79 W. Va. 526. The plea in abatement filed by defendant denies that there was any contract alleged in plaintiff's affidavit for attachment; or that by reason thereof plaintiff was compelled to purchase paper elsewhere at a greater price, to plaintiff's damage of $11,650. We do not think the New York statute of frauds could be relied upon under such a pleading. It will be observed that our cases which allow a defense of the statute of frauds under the general issue of nil debit or non assumpsit refer to our own statute of frauds which is applicable to contract made, or to be performed, in this state. If the contract is purely a New York contract made and to be performed there, into which the laws of that state enter as a part, governing its enforceability and regulating its enforcement, as contended for by defendant, then, if we are, by comity, to enforce and apply the statute of frauds, it should be set up and pleaded as required in that state. It the case of *Crane* v. *Powell,* 139 N. Y. 379; 34 N. E. 911 (affirmed in 19 N. Y. S. 220) and approved in *Mathews* v. *Mathews,* 154 N. Y. 288, it was held that where the complaint does not show that the case is within the statute of frauds, the defense of the statute must be specially pleaded, in order to be availing. After discussing former decisions announcing and establishing the rule, the opinion says: "The statute of frauds is a shield which a party may use or not for his protection, just as he may use the statute of limitations, the statute against usury, that against betting and gaming, and others that might be mentioned. I take it

to be a general rule of universal application that the statutes last mentioned are not available to a party unless specifically pleaded, and there is no reason for making the statute of frauds an exception to the rule. The present system of procedure is founded upon the idea that litigants should, when possible, know in advance the precise questions they must meet at the trial. When a contract is set out in the complaint as the cause of action and the defendant intends to assail it on some special or statutory ground, the general spirit of the system is not complied with unless notice is given of this intention to the opposing party by the pleadings.'' The rule that the statute must be pleaded, unless the complaint on its face shows a case within the statute, we regard as firmly established in the courts of the state of New York. Under the doctrine of comity, we do not think we should relax the rule, or adopt another one which would do violence to the laws of another state as interpreted by its courts. In *Bowman* v. *Miller,* 25 Grat. 331, the action was on a Maryland contract, and defendant pleaded payment, nil debit, and usury, the latter under the form given in the Virginia statute. The latter defense was denied, the court holding that if the Virginia court was to administer the Maryland remedy on the defense of usury, the defendant must file such a plea as the law of the latter state prescribed. The court said: ''It is sufficient to say, that if defendants desired the special relief allowed by the Maryland statute, it was incumbent upon them to put the matter in issue by proper pleadings. This is required by the statute of that state, and this seems to have been the view of the court in *Fant* v. *Miller,*'' 17 Grat. 47. In the last cited case it was held that a plea of usury of a foreign state, must state what the law of usury is in that state. There is respectable authority cited by plaintiff that if it is claimed that the law of another state applies to the exclusion of the law of the forum, the law of that state must be pleaded, and if the court of the forum takes judicial notice of the laws of that other state, then the facts upon which such claim is based must be pleaded. *Erie* v. *Welch* (Ohio), 105 N. E. 189. This is a corollary to the proposition that there must be a

pleading of some nature which brings the defense within the foreign statute, and give notice to the opposite party and the court that a defense under such statute will be relied upon. Neither the declaration, affidavit for attachment, nor the plea in abatement intimate that the contract was made in New York or to be performed there. It developed in the evidence that it was made in that state, and there is a controversy as to where it was to be consummated, whether in Wheeling or f. o. b. mill in New York. No fact is set up in the pleadings upon which a claim of the application of a foreign statute could be based; and we approve the holding in the Ohio case last cited, that when a foreign statute is relied upon, the facts on which the reliance is predicated must appear in the pleadings.

We hold that under the pleadings the statute of frauds of New York, had no place in the trial; and it follows that defendant's instruction No. 3, which told the jury to find for defendant on the issue as to the alleged September agreement (100,000 lbs. paper) was erroneous. Plaintiff's instructions No. 6 and 7, given to meet defendant's instruction No. 3, relating to the statute of frauds, and which told the jury that if they believed the contract was made and afterwards within a reasonable time confirmed by letter of Clayden, plaintiff's agent, containing a clerical error as to price, and corrected within a reasonable time in the presence of defendant or its agent, and assented to by him, was a sufficient note or memorandum to comply with the New York statute of frauds; and plaintiff's instruction No. 7, which told the jury that the letters offering and accepting the St. Regis paper at 6 ¾ cts. per pound, constituted a sufficient memorandum in writing to comply with the New York statute of frauds, were likewise erroneous. These errors were induced by defendant and it cannot complain. In the light of the verdict they were harmless.

Under the pleadings, if any statute of frauds is applicable to the contract it would be that of this state, which does not have a provision similar to the 1st section of the New York statute of which the 17th section of the English statute (29

Chas. II, ch. 3), is a prototype. Much of the argument and many of the points raised in the briefs relate to the question whether the contract was made and to be consummated in New York, all for the purpose of making the New York laws on the one hand or the West Virginia laws on the other applicable to its enforcement, and more especially the statute of frauds. We are treating the contract as a New York contract and governed by the laws of that state in its enforcement, as claimed by defendant; but we do not find it necessary to decide, and do not decide that point. We say that even if it was such as claimed by defendant, and the statute of frauds of that state was applicable, that statute was not properly pleaded, and has no place in the trial. Hence, the points raised as to whether the lex loci contractus or the lex fori governs, will not be decided.

On the amount of damages, if the jury found for plaintiff they were instructed by plaintiff's instructions No. 4 and 5 that if they believed there was a contract for the 100,000 lbs. of paper at $5.25 per hundred pounds, to be delivered within a reasonable time, not later than February or March, 1920, and another contract in March, 1920, for twenty tons of paper at 6 ¾c per pound to be delivered in that month, and that defendant failed to deliver any of the paper so sold and purchased and that plaintiff was compelled to buy paper in the open market of the same kind and quality, then plaintiff had the right to charge defendant with the difference between the contract price and what it was compelled to pay in the open market. And by defendant's instruction No. 4 the jury were told that if they found for plaintiff it would be entitled to recover the difference between the contract prices f. o. b. mills and the market price for the paper at the mills at the time for delivery of the paper, or if there was then and there no market at which such paper could be purchased by plaintiff, then at the most available market for such paper, and if such market price was in excess of said contract price, then such excess would be the amount which plaintiff would be entitled to recover on the issue joined. It is said that these instructions are in conflict, and would vitiate the ver-

dict. The measure of damages for breach of non-delivery of personal property purchased is ordinarily the difference between the contract price and the market value at the time and place of delivery. *Davis* v. *School Furniture Co.*, 41 W. Va. 721. "The proper measure of damages in general is the difference between the contract price and the market price of such goods at the time when (and place where) the contract is broken, because the purchaser having the money in his hands may go into the market and buy." Williston on Sales, sec. 599. It is well settled that when the seller is unable to fill his obligation when delivery of the goods is due, and by mutual consent the time is extended, the measure of damages is computed as at the time of the later date. *Ogle* v. *Earl Vane*, L. R. 2 Q. B. 276; *Ralli* v. *Rockmore*, 111 Fed. Rep. 874; *Brown* v. *Sharkey*, 93 Id. 157; *Sizer* v. *Welton*, 129 Ga. 143; *Connersville Wagon Co.* v. *Carriage Co.*, 166 Ind. 133; *Chemical Co.* v. *Geiss*, 143 Ala. 591. The St. Regis paper was to have been delivered or shipped in March, 1920. There can be no controversy of that. When was the time of delivery of the Aldrich paper? Defendant says the first car was to be delivered in October, 1919, and the remainder at a future indefinite time, if there was a consummated contract, a contract which would bind it. Plaintiff says the first car was to have been shipped in October and that upon defendant's failure to ship it agreed to take the car as soon as it could be delivered and kept inquiring and insisting upon the shipment until defendant's repudiation and refusal in March, 1920; and it will be noted from defendant's letter of March 11th it then said it would ship the Aldrich paper at the "old price" when it received the paper. It will be observed that defendant's instruction No. 4, said to be in conflict with plaintiff's Nos. 4 and 5, does not say when the delivery was to be made. It says plaintiff would be entitled to the "difference in price fixed by such contract f. o. b. mill, and the market price for said paper at such mill *at the time for delivery of such paper,* and if there was no market then and there for such paper, then at the most available market." Plaintiff's instruction fixed the time of delivery as within a "reasonable

time and not later than February or March, 1920." We do not think these instructions as to the time for the delivery are in irreconcilable conflict. The jury under these instructions could well fix the time for delivery and the breach as contemplated by the negotiations and subsequent conduct of the parties. Was plaintiff, after repudiation by defendant in March, restricted to the New York market as the most available market? The evidence is abundant that conditions in the market were extraordinary and it was compelled to purchase wherever spot paper could be obtained. Its need was imperative. The market price was about the same whether in Canada or elsewhere; and the actual prices paid for purchases made by plaintiff in New York City from Maurice O'meara & Co. and from International Pulp and Paper Company were in excess of the price of paper purchased in Ohio. The "nearest available market" under the existing conditions was wherever the paper could be found. Hastings, and other witnesses for defendant, who were large dealers and brokers in newsprint paper say that while some of the mills took advantage of the conditions and exacted high prices from their customers, in some instances as high at 14c and 18c per pound, there were other mills which did not do so; and by exercising reasonable diligence a purchaser might have obtained paper at 6c or 7c per pound. And Hastings says that one man to his knowledge did purchase at that price in New York City. However, he says he held his paper at higher prices, the price having been dictated by whatever the mills fixed. On the other hand, Ogden says he used diligence and purchased the paper on the open market wherever he could obtain it, at the lowest price. It is well settled law that plaintiff should minimize the damage and use every reasonable effort to do so. *Hurxthall* v. *Boom Co.* 53 W. Va. 87; *Davis* v. *School Furniture Co.*, 41 W. Va. 717. While we find no instructions upon the duty of plaintiff to minimize the damage, we note that the jury has found a verdict for $8,750, when the damage sustained was clearly shown to be $11,271.29. It would be impossible to say what induced this reduction in plaintiff's proved damages, whether by defendant's instruction No. 4 as to the time of delivery and the

place where the purchases should have been made by plaintiff, or whether plaintiff had not used due effort to minimize; but plaintiff does not complain of this.   Surely defendant cannot complain.

Defendant's reliance to defeat recovery is based on the assumption that no contract was made, because Gray did not have the order confirmed by his principal (defendant) and because the order, through plaintiff's mistake, did not go to the mill promptly, and consequently was never accepted by the mill; and that even if there was a contract as to the Aldrich paper it was barred by the New York statute of frauds.   The court proceeded on the theory that the contract for the Aldrich paper was governed by that statute and so instructed the jury in defendant's instruction No. 3.   The jury did not follow that instruction; and the court set aside the verdict.   It is manifest that if the court was right as a matter of law on this instruction, the verdict should have been set aside.   We have seen that the statute of frauds of New York had no place in the trial under the pleadings.   The controversy is then narrowed down to whether there was a contract, and if there was one the true measure of damage for its breach.   That there was a contract for both shipments is clear.   The instructions on the measure of damages are not irreconcilable and not necessarily conflicting, and the verdict under the evidence and these instructions is to the prejudice of plaintiff, who does not complain.   Whether Gray was the agent of defendant and bound it by the contract and his subsequent actions, was submitted to the jury by defendant's instructions, and there is no error alleged for that reason. Clearly he was the duly accredited agent.

We can find no error in the trial which would warrant the action of the court in setting aside the verdict.   The order of the court setting aside the verdict is reversed, the verdict reinstated and judgment rendered thereon in favor of plaintiff by this court.

*Reversed and judgment for plaintiff.*